UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6:24-CR-80-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| RICHARD PRESTON PARKER, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is before the Court on the Recommended Disposition filed by United States Magistrate Judge Hanly A. Ingram, [R. 56]. The Recommended Disposition addresses Defendant Richard Preston Parker's Motion to Suppress, [R. 32], in which Defendant seeks suppression of evidence found in his home pursuant to a search authorized by his partner, with whom Defendant shared the home. The United States responded in opposition, [R. 37], and Defendant did not reply. Judge Ingram conducted a teleconference on April 17, 2025, at which time the parties agreed to hold an evidentiary hearing on April 30, 2025. Following that hearing and based on the testimony given therein, [R. 49], Defendant filed briefing, [R. 50], and the United States filed in response, [R. 55], after which the matter was submitted to Judge Ingram. Judge Ingram then issued his Recommended Disposition, [R. 56], recommending that Defendant's Motion to Suppress, [R. 32], be denied. Defendant filed objections, [R. 57], to Judge Ingram's Recommended Disposition, to which the United States responded, [R. 58]. For the reasons set forth below, the Court will adopt Judge Ingram's Recommended Disposition to the extent that it is not inconsistent with this Order and will deny Defendant's Motion to Suppress.

- 1 -

I.      **BACKGROUND**

Defendant Parker was indicted on November 22, 2024, for the possession of firearms as a convicted felon in violation of 18 U.S.C. § 922(g)(1). [R. 1]. Defendant now seeks to suppress the weapons seized from his home on the ground that law enforcement's search thereof violated the Fourth Amendment. [R. 32]. Specifically, Defendant alleges that the consent supporting the search of his home—that provided by his partner, Minela Suljicic—was involuntarily given and thus was constitutionally inadequate to support a search. *See id.* In support, Defendant makes two allegations. First, Defendant claims that Ms. Suljicic was so intoxicated on the night of the search as to be incapable of voluntarily consenting to it. Second, Defendant argues that statements by law enforcement regarding the need to contact the Department for Community Based Services ("DCBS") to ensure the safety of Ms. Suljicic's child created a coercive environment in which Ms. Suljicic felt she had no choice but to consent or otherwise risk her child being taken from her, thereby rendering her consent involuntary. *See id.* The Court will consider, and ultimately reject, each of Defendant's arguments in turn.

The facts relevant to Defendant's Motion to Suppress occurred during two incidents in late September of 2024. First, on September 20, 2024, the Pulaski County Sheriff's Office received a report of domestic violence filed by Ms. Suljicic. [R. 32-2, pp. 3, 13]. While meeting with the officers in a parking lot away from the couple's shared home, Ms. Suljicic disclosed that Defendant had multiple firearms in the house. *Id.* at 3; [R. 33, USA-190 at 5:45–5:57].[1] She further warned that Defendant "would not go out without a fight." [R. 33, USA-190 at 6:58–7:03; R. 32-2 p. 3].

---

[1] R. 33 is a conventional filing of evidence contained on a flash drive, including videos of police body camera footage. The Court cites to each video as it was numbered on the flash drive. Except where otherwise noted, the Court cites to the time stamp from the video progress bar, rather than to the real-world time stamp located in the top-right corner of the body camera footage.

Although Defendant had an outstanding arrest warrant at the time, law enforcement did not attempt to arrest Defendant or seize the reported cache of weapons. [R. 10; R. 32-2, p. 24]. After the incident, Ms. Suljicic and her child briefly lived at a domestic violence shelter before returning to the house they shared with Defendant. [R. 50-2, p. 2].

The second event relevant to this case took place on September 29, 2024, beginning when Ms. Suljicic contacted 911 Dispatch via text message at approximately 8:30 p.m. to report another domestic violence incident involving Defendant. [R. 50-2, p. 2]. Law enforcement officials from the Pulaski County Sheriff's Office arrived at the home later that night but were unable to reach Ms. Suljicic. [R. 32-2 p.16]. Officers solicited the assistance of Defendant's mother to attempt contact via phone with Defendant and with Ms. Suljicic, to which neither Defendant nor Ms. Suljicic responded. *Id.* Around this time, Defendant's mother informed police that Ms. Suljicic had a drinking problem. *Id.* Defendant's niece, who had also been contacted, further told police that she was present at Defendant's house approximately two hours prior to Ms. Suljicic's text to 911 Dispatch, at which time she observed both Defendant and Ms. Suljicic drinking. *Id.*

After hours without a response from Defendant or Ms. Suljicic, at approximately 12:30 a.m. on the morning of September 30, 2024, law enforcement entered the house to execute a pending outstanding warrant for Defendant's arrest. [R. 32-2, p. 22; R. 49, p. 55; R. 10]. Defendant was handcuffed and taken to the living room of the house before being removed and transported for detention. [R. 49 pp. 54–55]. Shortly after entering the house, Sheriff Robert Wayne Jones spoke with Ms. Suljicic to determine whether her three-year-old child would be safe remaining in the house. *Id.* at 56. During that conversation, Ms. Suljicic told him that she had been drinking that night, leading Sheriff Jones to express concern about the child's safety. *Id.* at 66–69;

- 3 -

[R. 33, USA-14 at 2:33–2:48]. Sheriff Jones inquired as to why Ms. Suljicic had not answered her phone since texting 911 Dispatch, prompting her to leave the room and navigate the house to retrieve it and check for missed calls. [R. 49 pp. 58–59; R. 33, USA-14 at 2:50–4:00]. Upon her return to the room, Sheriff Jones proposed that the child stay with Defendant's mother, but Ms. Suljicic declined his suggestion. [R. 49 pp. 6–7, 82; R. 33, USA-14 at 4:00–4:21]. Sheriff Jones warned her that this meant law enforcement "might have to call [DCBS]" to the scene and that DCBS "may take the child." [R. 33, USA-14 at 4:21–4:25]. Ms. Suljicic nodded calmly in response and said "okay." *Id.* at 4:24–4:26.

Less than ten minutes after this conversation between Sheriff Jones and Ms. Suljicic, a different officer approached Ms. Suljicic and asked her to show him the firearms she had disclosed in her earlier conversation with law enforcement on September 20, 2024. [R. 33, USA-15 at 0:21–0:27]. Ms. Suljicic immediately led officers into a back bedroom in the house and, after moving household items out of the way, revealed a hidden compartment in the closet and indicated that she "might need help" opening it. *Id.* at 0:25–1:10; [R. 32-2, p. 16]. Officers then opened the compartment, finding the cache of weapons alongside other tactical gear. [R. 33, USA-15 at 3:10–3:33; R. 32-2, pp. 16, 18–19].

Meanwhile, acting pursuant to Sheriff Jones's order to contact DCBS, Sergeant Preston Pitman radioed to dispatch to call DCBS to the scene. [R. 49, p. 38]. Dispatch called Ms. Mary Barnett, the DCBS on-call supervisor that night, who then called Ms. Aimee Hines, the social service worker who responded to the scene. *Id.* at 18, 33. Ms. Barnett told Ms. Hines that an arrest had occurred at the scene, a mother and child remained there, and the mother was three times over the legal limit for alcohol. *Id.* at 19–20. Ms. Hines arrived at the house at approximately 2:00 a.m.

and remained there until approximately 3:45 a.m. *Id.* at 20. At around 3:15 a.m., Ms. Hines asked that a field sobriety test be performed on Ms. Suljicic, which Ms. Suljicic passed while showing "no sign of impairment." *Id.* at 22, 42. Ms. Hines elected to leave Ms. Suljicic's child in the home and established a safety plan requiring Ms. Suljicic to remain at the house until Ms. Hines returned at 8:00 a.m. later that morning. *Id.* at 22–23, 28. Ms. Hines visited the home at 8:15 a.m. later that morning without incident. *Id.* at 27.

Defendant's Motion to Suppress alleges that Ms. Suljicic's consent to the search of her home, which resulted in her revealing Defendant's stash of weapons and tactical gear, was an involuntary product of her intoxication and of police coercion. [R. 32-1, p. 10]. In support, Defendant cites Ms. Suljicic's intoxication "to an extreme level" of three times over the legal limit for alcohol and argues that "she would have done anything to prevent her child [from] being removed from her care." [R. 50-1, p. 6]. Defendant also points to the contradictory testimony between Ms. Suljicic and the three police officers who testified at the evidentiary hearing as evidence of the unreliability of the testifying officers. *Id.* at 4. Specifically, Defendant cites Ms. Suljicic's recollection of submitting to a Preliminary Breath Test ("PBT")[2] on the night in question alongside the written record from DCBS that Ms. Suljicic was three times over the legal limit for alcohol, in contrast with the testimony of Sheriff Jones that none of his officers present at the scene recalled administering a PBT to Ms. Suljicic or receiving such a result. [R. 49, pp. 8, 54–55; R. 50-2, p. 1].

In response to Defendant's claim that Ms. Suljicic's consent was given involuntarily, the United States points to Ms. Suljicic's direct testimony during the evidentiary hearing on this

---

[2] The hearing transcript, [R. 49], mistakenly refers to PBT as "PVT."

matter. [R. 49, pp. 5–9]. There, Ms. Suljicic testified that she remembered the night in question, she felt comfortable refusing the officers' request to show them the weapons, she did not feel pressured or threatened by police regarding custody of her daughter, and it was her voluntary decision to reveal Defendant's guns to the police. [R. 49, pp. 7–9]. The United States also responds to Defendant's assertion that the testimony of law enforcement officials regarding the absence of a PBT should be discredited. In doing so, the United States notes that none of the phone calls received by Ms. Barnett on the night in question contained information about PBT results. [R. 49, pp. 32, 34, 37–38]. From this, the United States suggests, the Court might infer that Ms. Barnett included PBT results in the PCBS report because she was confused about the facts relevant to the scene during the late-night call she received from police. [R. 55, p. 4]. Specifically, the United States notes that Ms. Barnett recorded Ms. Suljicic's level of intoxication as *three* times the legal limit for alcohol—the same number known to be the age of Ms. Suljicic's child (*three* years old). *Id.*; *see also* [R. 49, p. 80].

On July 1, 2025, Judge Ingram issued his Recommended Disposition, [R. 56], recommending that Defendant's Motion to Suppress be denied. Defendant submitted objections to the Recommended Disposition, arguing that "[t]he government failed to provide sufficient evidence to rebut the presumption that Ms. Suljicics [sic] intoxication impaired her ability to give valid consent" and that officers' "discussion of custody issues . . . could have created implicit pressure, leading her to believe that compliance was necessary to avoid adverse consequences." [R. 57, pp. 4–5]. The United States responded to these objections, claiming that video footage and hearing testimony revealed Ms. Suljicic's lucidity and responsiveness on the night of September 29–30, 2024. [R. 58, p. 2]. Further, Ms. Suljicic had already revealed the presence of the guns

during her conversation with police on September 20, 2024, and she directly testified that she did not feel pressured to comply with law enforcement on the night of September 29–30. *Id.* at 2–3. Defendant did not file a reply. This matter is therefore fully briefed and ripe for review.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 636(b)(1)(B), a district court judge may designate a Magistrate Judge to conduct evidentiary hearings and submit proposed findings of fact and recommendations for the disposition of certain motions, including motions to suppress evidence. Within fourteen days of being served a copy of that recommended disposition, any party may file written objections to the Magistrate Judge's proposed findings and recommendation. 28 U.S.C. § 636(b)(1). This Court must then "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; *see also Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). A specific objection, which preserves the issue for appeal, "explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic." *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 1997) (quoting *Smith v. Chater*, 121 F.3d 709, 1997 WL 415309, *2 (6th Cir. 1997)) (internal quotation marks omitted). Courts need not conduct de novo review of general objections that fail to identify specific factual or legal issues, because it duplicates the Magistrate Judge's efforts and wastes judicial economy. *Howard v. Sec. of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Ultimately, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

### III.    ANALYSIS

### A.  The Fourth Amendment Voluntariness Standard

The Fourth Amendment forbids "unreasonable searches and seizures." U.S. Const. amend. IV. Searches typically require a warrant or probable cause to be considered reasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Searches "conducted pursuant to a valid consent" constitute one such exception. *Id.* at 358 n.22; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *U.S. v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996). Valid consent involves more than mere "acquiescence to a claim of lawful authority"; it must be "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1973). The prosecution bears the burden of establishing "that consent was, in fact, freely and voluntarily given." *Id.* at 548. In doing so, the prosecution can point to the "words, gesture, or conduct" of the consenting party. *Lawson v. Creely*, 137 F.4th 404, 419 (6th Cir. 2025) (quoting *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004)). To meet its burden, the prosecution must introduce "clear and positive testimony" that the consent was "unequivocal, specific, intelligently given, and not influenced by duress or coercion." *United States v. Wilson*, 806 F. App'x 450, 453 (6th Cir. 2020) (first quoting *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998); and then quoting *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008)).

Whether consent to a search was given voluntarily is "a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. Although "knowledge of the right to refuse consent is one factor to be taken into account," a target may give valid consent even if they are unaware of their right to refuse, so long as the totality of the circumstances indicates that their consent was not "the product of duress or coercion, express or implied . . . ."

- 8 -

*Id.* Additional considerations identified by the United States Supreme Court include whether the apparently consenting party is asked "subtly coercive police questions" or holds a "possibly vulnerable subjective state . . . ." *Id.* at 229. The Sixth Circuit's test also accounts for various nonexclusive factors: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *Wilson*, 806 F. App'x at 453 (quoting *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999)). Other indicia of freely given consent include "the absence of an overt act or threat of force, promises made to a defendant, or indications of more subtle forms of coercion that might flaw a defendant's judgment . . . ." *Lawson*, 137 F.4th at 419 (citing *Morphis v. United States*, 110 F. App'x 527, 530 (6th Cir. 2004)).

Subject to voluntariness analysis under the totality-of-the-circumstances test, the Sixth Circuit recognizes that "medication or intoxication may diminish the capacity to consent to the extent it undermines an individual's grasp on the reality of what he is doing." *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010). Because "[d]rug-induced impairment . . . is a matter of degree," a court's inquiry into intoxication should "gauge the impact of drugs on a case-by-case basis and in view of other circumstances at play." *Id.* In other words, there is no *per se* rule—no presumption—that intoxication defeats an individual's capacity to consent. *Id.* Accordingly, the consent of an intoxicated individual may still be voluntary when the person is "coherent and fails to exhibit any visible impairment." *United States v. Griffin*, No. 96-5326, 1997 WL 487325 at *3 (6th Cir. Aug. 15, 1997) (per curiam).

Another factor affecting the voluntariness analysis is the presence or absence of police coercion. *Bumper*, 391 U.S. at 550 ("Where there is coercion, there cannot be consent."); *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (discussing coercion in the Fifth Amendment context). Although the defendant need not show coercive police activity as a prerequisite in order to render their consent involuntary in the Fourth Amendment context, courts consider the presence of such activity under the broader totality-of-the-circumstances inquiry. *See Montgomery*, 621 F.3d at 573 ("[T]he involuntariness prong of a *Miranda* waiver requires 'coercive police activity [as] a necessary predicate,' something generally not required in Fourth Amendment consent cases.") (internal citations omitted) (quoting *Connelly*, 479 U.S. at 167). Coercion can occur "by explicit or implicit means, [and] by implied threat or covert force." *Schneckloth*, 412 U.S. at 228. It may arise through "subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.* at 229. The Sixth Circuit has recognized that coercion may be present where police "gain[] entrance to the house without disclosing the official nature of their visit," have a prior relationship with the consenting party, use "force or duress" or the threat thereof, make demands or promises to the consenting party, or "use . . . language or tone of voice indicating that compliance with the officer's request might be compelled." *Smith v. State of Tenn., Dep't of Safety*, 850 F.2d 692, at *2 (6th Cir. 1988); *Lawson*, 137 F.4th at 419 (citing *Morphis*, 110 F. App'x at 530); *Wilson*, 806 F. App'x at 453 (quoting *United States v. Peters*, 194 F.3d 692, 697 (6th Cir. 1999)). By contrast, circumstances that may not rise to the level of coercion when considered as one of many inputs under the totality of the circumstances test include where the consenting party holds a "subjective concern" over potential adverse consequences of a search, such as the loss of a job, *Smith*, 850 F.2d at *2, or even where the consenting party feels "greatly

afraid" between officers' entry and their consent. *United States v. Scott*, 578 F.2d 1186, 1189 (6th Cir. 1978) (cert. denied).

### B. Application to the Present Case

#### 1. Intoxication

As to the issue of Ms. Suljicic's intoxication negating her consent, Defendant's briefing prior to Judge Ingram's Recommended Disposition focused on three alleged facts: (1) a report stating that Ms. Suljicic failed a PBT with a measurement of three times the legal limit for alcohol, (2) the testimony of Ms. Suljicic in which she recalled taking a breath test in her bedroom prior to the arrival of DCBS and Ms. Hines's request for a field sobriety test, and (3) body camera footage showing Ms. Suljicic "answering questions with her eyes closed," "swaying," slurring her speech, and falling when attempting to rise from a bed. [R. 50-1, pp. 3–4]. Defendant argued that Judge Ingram should discount contradictory evidence that undermined the above allegations, including "the testimony of Sheriff Jones, Officer Preston Pitman, and Officer James Pitman," none of whom recalled personally subjecting Ms. Suljicic to a PBT or observing any other officer doing so. [R. 50-1, p. 4; R. 49, pp. 54–55].

After weighing the evidence presented, Judge Ingram's Recommended Disposition emphasized different facts regarding the credibility of the PBT, summarizing the result as follows:

> [A] written report says Ms. Suljicic failed a PBT test, she admits she took one, but no evidence at the hearing was offered by either side as to whom administered the test or what its actual result was. Having apparently been relayed by [Ms.] Barnett to [Ms.] Hines before [Ms.] Hines traveled to the scene, there is no proof of the source of the reported PBT failure or, in turn, any way to assess the reliability of that report.

- 11 -

[R. 56, p. 6]. Accordingly, Judge Ingram concluded, "there is no reliable way to assess this reported PBT failure or include it in the analysis of the totality of the circumstances."[3] *Id.* Importantly, Judge Ingram reasoned that "it would not matter" if the supposed PBT results were nevertheless included in the totality-of-the-circumstances analysis, since "the video recordings and hearing testimony do not establish impairment to a degree sufficient to invalidate her consent." *Id.* Specifically, Judge Ingram notes that although "Ms. Suljicic was somewhat groggy at the beginning of her conversation with Sheriff Jones, and at one point fell while trying to calm her dog," those incidents "are outweighed by the visible evidence of Ms. Suljicic's clarity throughout the remainder of the footage." *Id.* As shown on the body camera footage, Ms. Suljicic navigated her home steadily, made her way around obstacles like furniture, an oversized dog bed, and the officers present at the scene, and had a clear and rational conversation with Sheriff Jones regarding her child's custody. *Id.* She immediately showed officers the location of Defendant's guns when asked and directed them on how to remove the board covering the concealed compartment, behavior "all consistent with someone capable of understanding the nature of their actions and decisions." *Id.* at 7.

In response to the Recommended Disposition, Defendant disputes Judge Ingram's conclusions of fact regarding the PBT and the body camera footage. Defendant argues that the report in the record "indicat[ing] that [Ms. Suljicic] significantly failed a breath test rais[es] serious concerns about her capacity to provide voluntary consent." [R. 57, p. 5]. Although Defendant points to body camera footage showing Ms. Suljicic "answering questions with her eyes closed,"

---

[3] Although Judge Ingram makes this finding, the Court, as outlined herein, believes the weight of the record evidence indicates that a PBT was likely administered. *See infra* Section III(B)(1). Regardless, the Court reviews all the evidence presented under the totality of the circumstances and therefore allocates weight to the evidence presented in accordance with its credibility and with consideration of any evidence to the contrary.

- 12 -

"swaying," slurring her speech, and falling when attempting to rise from a bed, Defendant does not respond to the conflicting facts discussed by Judge Ingram, such as Ms. Suljicic's steady movement throughout the home, clear conversation with Sherriff Jones, and immediate and rational response to officers' inquiries. *Id.* at 3. Nor does Defendant confront Ms. Suljicic's clear testimony at the evidentiary hearing in which Ms. Suljicic attested to her comfort in refusing the officers' request; instead, Defendant's counsel merely elicited the concession that no conversation occurred between Ms. Suljicic and law enforcement in which Ms. Suljicic was affirmatively told that she need not consent to law enforcement's requests. *See* [R. 49, pp. 10–11]. Ultimately, Defendant's Response asserts that "[t]he government failed to provide sufficient evidence to rebut the presumption that Ms. Suljicics [sic] intoxication impaired her ability to give valid consent." [R. 57, p. 5].

Taken together, the Court finds that the facts and law warrant rejecting Defendant's claim that Ms. Suljicic's consent was involuntary due to her level of intoxication. To start, Defendant misstates the appropriate legal standard for incorporating intoxication into the totality-of-the-circumstances test. Defendant claims that the United States must rebut a "presumption" that the intoxication of a consenting party negates their apparent consent without citing any authority to support the existence of such a presumption. [R. 57, p. 5]. In fact, the Sixth Circuit expressly rejected such a presumption in *United States v. Montgomery*, writing that "a per se rule that medication (or intoxication) necessarily defeats an individual's capacity to consent" goes "a bridge too far." 621 F.3d at 572. Instead, the totality-of-the-circumstances test applies, "making it appropriate to gauge the impact of drugs on a case-by-case basis and in view of other circumstances at play." *Id.*

- 13 -

Next, in consideration of the relevant facts and circumstances to incorporate under the totality-of-the-circumstances test in the present case, the Court agrees that the evidence concerning the apparent PBT is conflicting. Ultimately, the Court finds that the weight of the evidence supports that a PBT was likely administered. A chronological examination of the events of September 29–30, 2024, supports this finding. Officers arrived on the scene at approximately 12:30 a.m. and cleared the house by about 12:41 a.m. [R. 32-2, p. 22]. First, the body camera footage shows officers at the scene in the living room clearly discussing a PBT at approximately 12:58 a.m. by inquiring whether anyone has a PBT. [R. 33, USA-15 at 0:58:14–58:16].[4] Only a few minutes later, at approximately 1:01 a.m., there is another clear reference to a PBT where an officer appears to say, "why don't you take the PBT," presumably to Ms. Suljicic. [R. 33, USA-15 at 1:01:31–32]. Then, approximately thirty seconds later, body camera footage appears to show Ms. Suljicic potentially taking the PBT next to the bed in a bedroom at the back of the house—precisely where Ms. Suljicic later testified that the test occurred. [R. 33, USA-15 at 1:02:01; R. 49, p. 8]. At approximately 1:13 a.m., Ms. Barnett called Sergeant Preston Pitman, who was on the scene at that time. [R. 49, p. 33]. Shortly thereafter, at approximately 1:20 a.m., Ms. Barnett conveyed the PBT result to her colleague, Ms. Hines, sharing that the mother at the scene (i.e., Ms. Suljicic) was three times the legal limit for alcohol. *Id.* at 19–20. Although Ms. Barnett testified that could not recall the details of her conversations with either Sergeant Pitman or Ms. Hines, Ms. Hines testified that Ms. Barnett conveyed the PBT result to her during their call. [R. 49, pp. 14, 35].

---

[4] Unlike in the Court's previous citations to video evidence, in recounting this timeline, the Court cites to the real-world time stamp located in the top-right corner of the body camera footage, rather than to the time stamp from the video progress bar.

- 14 -

Ultimately, the PBT result was later incorporated into Ms. Hines's DCBS report detailing the events of the night in question. [R. 50-2, p. 2].

Other record evidence as presented at the evidentiary hearing also supports the Court's conclusion that a PBT was likely administered. As discussed, Ms. Barnett conveyed the PBT result to Ms. Hines at approximately 1:20 a.m. over a phone call. [R. 49, pp. 19–20]. Ms. Barnett's phone records reveal only two potential sources from which she could have learned the PBT result: (1) the call she received from 911 Dispatch and (2) the call she made at approximately 1:13 a.m. to Sergeant Preston Pitman, who was at the scene at the time. *Id.* at 32–34, 37. The recording of the 911 call contained no information about Ms. Suljicic's level of intoxication, strongly suggesting that Sergeant Pitman was the source of the information concerning the PBT. *Id.* at 31–32. Sergeant Pitman, however, testified that he could not recall the details of his conversation with Ms. Barnett, that he did not personally administer a PBT to Ms. Suljicic, and that he could not recall another officer administering such a test or learning the result thereof. *Id.* at 37–38. Ms. Suljicic, however, testified to being administered a PBT and recalled the specific location in her home where it occurred—beside the bed—and Ms. Hines testified that Ms. Barnett conveyed the PBT result to her and that she ultimately included that result in her DCBS report about the night in question. *Id.* at 8, 14. Elsewhere, the Court credits the testimony of Ms. Suljicic that she remembered the night in question, she felt comfortable refusing the officers' request to show them the weapons, she did not feel pressured or threatened by police regarding custody of her daughter, and that it was her voluntary decision to reveal Defendant's guns to the police. [R. 49, pp. 7–9]. The Court similarly credits Ms. Hines's statements that she had no trouble communicating with Ms. Suljicic throughout the evening, that Ms. Suljicic passed a field sobriety test, and that she ultimately decided not to

order Ms. Suljicic's child removed from the home. *Id.* at 13–14; 20–22; 28. And as mentioned, officers on video can also clearly be heard asking about the availability of a PBT, then saying "why don't you take the PBT" while in the same room as Ms. Suljicic, and then seen potentially administering a PBT to Ms. Suljicic, all within the span of less than four minutes. [R. 33, USA-15 at 0:58:14–58:16, 1:01:31–01:32, 1:02:01]. In sum, considering the body camera video evidence, other evidence presented, and the hearing testimony, the Court concludes that the weight of the evidence suggests a PBT was likely administered. Further, the only evidence in the record concerning its result is that Ms. Suljicic was recorded at three times the legal limit for alcohol.

Even considering that the PBT was administered and Ms. Suljicic registered at three times the legal limit for alcohol, the Court's assessment of Ms. Suljicic's capacity to consent does not change. [R. 56, p. 6]. As previously discussed, the Sixth Circuit has held that "voluntary consent can be given even by a person under the influence of drugs, when that person is coherent and fails to exhibit any visible impairment," such as when they are "not swaying or unsteady . . . and appear[] to be coherent." *Griffin*, 1997 WL at *3; *United States v. Fletcher*, 295 F. App'x 749, 757 (6th Cir. 2008). The Sixth Circuit's previous line of cases has deemed consent to be voluntary even where, prior to consent, the consenting party received eight milligrams of morphine intravenously while in the hospital after being shot with a pellet gun, *Montgomery*, 621 F.3d at 574, smoked crack cocaine prior to the arrival of police, *Griffin*, 1997 WL at *2–3, was drunk at the time of consent, *United States v. Perry*, 703 F.3d 906, 909 (6th Cir. 2013) (abrogated on other grounds), or consumed alcohol the night before a consented-to search the following morning, at which time officers smelled alcohol on the consenting party's breath. *Fletcher*, 295 Fed. App'x 694. Across these cases, the courts deemed the consent voluntary, as evidenced by the defendant "ha[ving] no

trouble understanding and answering questions," *Montgomery*, 621 F.3d at 574, appearing "coherent and in control of the premises," *Griffin*, 1997 WL at *3, and "not swaying or [being] unsteady." *Fletcher*, 295 Fed. App'x 694.

The compelling video evidence along with the other evidence presented supports the finding that Ms. Suljicic was not so intoxicated as to be incapable of voluntary consent—a conclusion Defendant fails to effectively rebut in his objections to the Recommended Disposition. Defendant accurately points to body camera footage showing Ms. Suljicic's apparent initial disorientation upon being awakened by Sheriff Jones, as well as her fall later while rising from her bed. [R. 57, p. 3; R. 33, USA-14 at 0:11–1:15; R. 33, USA-15 at 2:18–2:25]. Any unsteadiness dissipates within moments, however, as shown by her adept navigation of obstacles in the home to retrieve her cell phone and her prompt and relevant responses to questions by officers, including to their inquiry as to the location of Defendant's firearms. [R. 33, USA-14 at 2:50–4:00, 4:09–5:00; R. 33, USA-15 at 0:22–1:41]. In retrieving her cell phone, Ms. Suljicic stepped over and around obstacles, including an oversized dog bed and a coffee table, and then quickly unlocked her phone and, with her arm and hand steady, held out her phone for Sheriff Jones to view it. [R. 33, USA-14 at 2:50–4:00, 5:39–5:47]. And, concerning her fall from the bed, which occurred about fifteen minutes after her conversation with Sheriff Jones at approximately 1:00 a.m., Ms. Suljicic appears to scoot off the bed while holding her dog in both arms and attempting to calm it, explaining her momentary imbalance and inability to steady herself to avoid falling. [R. 33, USA-15 at 2:18–2:25]. Additionally, in revealing the location of Defendant's firearms to law enforcement, Ms. Suljicic adeptly moved both small and large items off her closet shelf in a methodical and organized fashion without dropping any items or needing the assistance of law

enforcement. [R. 33, USA-15 at 0:35–0:54]. The body camera evidence throughout the course of the evening further reflects that Ms. Suljicic understood every question she was asked, responded immediately and appropriately, and did not ask officers to repeat or clarify their questions. *See, e.g.,* [R. 33, USA-14 at 4:00-4:30; R. 33, USA-15 at 0:21–1:11].

Testimony at the evidentiary hearing is corroborated by the video evidence and further supports the Court's conclusion. Sheriff Jones stated that Ms. Suljicic "was understanding everything clearly" and did not exhibit expected signs of extreme intoxication, such as confusion or repetitive questions. [R. 49, p. 64]. Ms. Hines, who arrived at the scene by 2:00 a.m., recalled while on the stand that over the course of the hours in which she was with Ms. Suljicic, she had no trouble answering questions or completing forms and did not appear irrational or incoherent. *Id.* at 13–14. Likewise, Deputy Pitman described Ms. Suljicic as having "carried on an educated conversation" during the several hours in which he was with Ms. Suljicic at the scene, and notes that she passed a field sobriety test he administered later that night while showing "no sign of impairment," which Ms. Hines corroborates *Id.* at 22; 41–42. Finally, Ms. Suljicic's testimony demonstrated her accurate recollection as to the details of the night in question. *Id.* at 5–11.

Defendant argues that the officers' testimony as to Ms. Suljicic's coherence should be discredited, including as to the absence of a PBT. *See* [R. 57, pp. 2–3]. While the Court understands Defendant's concerns related to the officer testimony concerning the PBT, the only officer testimony recited herein and relied on by the Court is corroborated by the video and other evidence. *See, e.g.,* [R. 33, USA-14 at 2:50–4:00 (Ms. Suljicic adeptly navigating obstacles in her home); R. 33, USA-15 at 0:22–1:41 (Ms. Suljicic steadily and methodically removing items from her closet)]. As to the officers' testimony concerning the PBT, Judge Ingram concluded that the

officers were adequately subject to cross-examination at the hearing, and overall, Judge Ingram found the officer testimony "quite reliable." [R. 56, p. 8]. Importantly, however, no one at the hearing questioned the officers about these particular video clips discussing a PBT. *See* [R. 49]. Because the search in question occurred approximately seven months before the evidentiary hearing, it is arguably conceivable that the time lapse could have affected the officers' recollections of the night in question regarding the PBT. *See* [R. 32-2, p. 16; R. 49, p. 1]. However, the Court has now pointed to strong video evidence from the body camera footage in which the officers clearly and repeatedly discuss a PBT, and it appears Ms. Suljicic is administered a PBT. [R. 33, USA-15 at 0:18–20, 0:26–27, 3:34–36, 4:05].[5] Therefore, the Court will require the United States to inquire and supply additional information to hopefully close the evidentiary mystery concerning the PBT, as outlined below. *See infra* Section IV.

Altogether, the Court has considered the evidence presented surrounding Ms. Suljicic's alleged intoxication on September 29–30, 2024, including the police report from the night in question, [R 32-2, pp. 14–22], the police body camera footage, [R. 33], the hearing testimony, [R. 49], Judge Ingram's Recommended Disposition, [R. 56], and the parties' objections to Judge Ingram's Recommended Disposition, [R. 57; R. 58]. In light of the evidence presented, the Court finds that the government has met its burden by providing "clear and positive testimony" to support a finding of voluntariness.

---

[5] Although the Court references these time stamps from the body camera footage in which a PBT is repeatedly discussed, the police report from the night in question makes no mention of a PBT being administered. *See* [R. 32-2, pp. 14–22].

## 2. Coercion

Defendant secondly argues that Ms. Suljicic's apparent consent was involuntary because it resulted from coercion—namely, from the "clear concern she had that the officers were going to take her child away." [R. 50-1, p. 5]. Defendant develops this argument less robustly than Defendant's claim regarding intoxication.

Upon consideration of the evidence presented, Judge Ingram's Recommended Disposition found that "[t]he facts here . . . fail to establish duress and coercion, or that Ms. Suljicic was intimidated into consenting to the search." [R. 56, p. 9]. To start, body camera footage shows that Ms. Suljicic was asked about the location of Defendant's firearms *after* her conversation with Sheriff Jones, in which she consented to Sheriff Jones calling DCBS rather than permitting Defendant's mother to take temporary custody of her child. [R. 57, p. 9; R. 33, USA-14 at 4:21–4:26; R. 33, USA-15 at 0:21–1:47]. Further, the officer who asked Ms. Suljicic about the firearms was not involved in the custody conversation, and instead made his inquiry later and in a different part of the house. [R. 33, USA-15 at 0:21–0:46]. Ms. Suljicic also directly testified that she felt comfortable refusing the officers' request to show them the weapons, she did not feel pressured or threatened by police regarding custody of her daughter, and it was her voluntary decision to reveal Defendant's guns to the police. [R. 49, pp. 7–9]. Moreover, law enforcement already knew about the firearms prior to the events of September 29–30, as Ms. Suljicic revealed their presence unprompted during her conversation with law enforcement on September 20, 2024—a time when the potentially intimidating factors Defendant now presents were not in play. [R. 33, USA-190 at 5:45–5:57]. Such evidence, Judge Ingram determined, was sufficient for the United States to meet its burden of proof in showing that Ms. Suljicic was not coerced into consenting to the search. [R. 56, p. 9].

Defendants' objections to Judge Ingram's Recommended Disposition mostly reiterate assertions made in prior briefings but also raise one issue not addressed by Judge Ingram or the United States. First, Defendant restates that Ms. Suljicic was "questioned by officers shortly after a domestic violence incident, during which she was likely in a vulnerable emotional state" and that "officers [sic] discussion of custody issues regarding her three-year old daughter could have created implicit pressure, leading her to believe that compliance was necessary to avoid adverse consequences." [R. 57, p. 5]. But then, of note, Defendant cites to body camera footage allegedly showing Ms. Suljicic "beg[] officers not to take her child just before she removes the paneling in the closet" where the guns were hidden. *Id.*

Despite Defendant's objections, the Court finds that the facts and law warrant rejecting Defendant's claim that Ms. Suljicic's consent was the product of coercion. While coercive conduct is a prerequisite to showing involuntariness in the Fifth Amendment context, coercion is merely one factor considered among the totality of the circumstances in the Fourth Amendment context. *Montgomery*, 621 F.3d at 573 (citing *Connelly*, 479 U.S. at 167 (Fifth Amendment); *Schneckloth*, 412 U.S. at 241, 247 (Fourth Amendment)). In other words, coercive conduct supports a finding of involuntariness under the totality-of-the-circumstances test, but it is not necessary to such a finding. The Sixth Circuit has listed as examples of coercive behavior "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled," *Wilson*, 806 F. App'x at 453 (quoting *Peters*, 194 F.3d at 697). Analogy to similar facts in other cases also proves elucidative of an appropriate standard.

First, the United States Supreme Court considered facts similar to these in *Coolidge v. New Hampshire*, where a woman revealed clothes and firearms to police that were later used to convict her husband of murder and other crimes. 403 U.S. 443, 446, 448 (1971). The defendant, Mr. Coolidge, later sought to suppress the firearms by arguing that his wife only produced them in compliance with a police "demand" rather than by giving voluntary consent. *Id.* at 487. Testimony from a pretrial hearing produced evidence of an exchange somewhat similar to that in the present case. Upon entering the shared home with permission, two plainclothes police officers asked Mrs. Coolidge if her husband owned any guns, to which she replied "Yes, I will get them in the bedroom." *Id.* at 486. She then led them to the bedroom, removed four guns from a closet, indicated to the police that she felt she had nothing to hide, and said they were free to take what they wanted. *Id.* In its assessment, the Supreme Court acknowledged that in situations where one spouse is questioned about the activities of their partner, "there no doubt always exists forces pushing the spouse to cooperate," including "the simple but often powerful convention of openness and honesty, the fear that secretive behavior will intensify suspicion, and uncertainty as to what course is most likely to be helpful to the absent spouse." *Id.* at 487–88. But these pressures alone are not constitutionally suspect, meaning other unconstitutional conduct such as coercion is necessary to exclude evidence resulting from a search. *Id.* at 488. The facts of the case revealed no such coercion. Of note to the Supreme Court were the "logical" nature of police questions, the fact that "Mrs. Coolidge of her own accord produced the guns and clothes for inspection," and the absence of any attempt by police "to coerce or dominate her, or . . . to direct her actions by the more subtle techniques of suggestion that are available to officials in circumstances like these." *Id.* at 488–90.

- 22 -

The Sixth Circuit's decisions across multiple cases are also instructive. In *Lawson v. Creely*, the court considered the constitutionality of a search of the defendant's bag undertaken by the defendant herself. 137 F.4th at 411–12, 419. There, in a conversation in front of two police officers, a school superintendent asked the defendant, an employee, whether she possessed a firearm on school grounds. *Id.* at 410. Ms. Lawson responded that she "had one with [her] this weekend" and then, without being directed to search her bag, examined its contents and stated, "[i]t is there in the bottom." *Id.* at 411. From these facts, the Sixth Circuit concluded that no search occurred at all, since "Lawson *herself* revealed the presence of the firearm in her bag without being directed to do so." *Id.* at 419. In dicta, the court further noted that "[e]ven if we determined that a search had occurred," the facts nevertheless support the conclusion that the employee consented to it. *Id.* at 419 n.9. Of importance to the court were the facts that "Lawson is an educated adult; . . . there was no significant prior questioning or physical punishment; and there were no threats, promises, or other coercive measures applied to Lawson." *Id.*

By contrast, the facts of *United States v. Carr* present a coercive scenario distinct from the case before this Court. 187 F. App'x 602 (6th Cir. 2006) (per curiam). There, the Sixth Circuit affirmed the district court's conclusion that "consent was not voluntary, unequivocal, specific, and intelligent" under a clearly erroneous standard of review. *Id.* at 607. The dispute in the case centered on the consent given by a third party, Mungle, to search the defendant's home, to which Mungle possessed a key. *Id.* at 605. Prior to the disputed consent regarding the entire home, Mungle previously consented to police entry into the defendant's basement in order to exonerate himself from an accusation of attempted auto theft by Thompson, a police officer. *Id.* at 603–04. The accusation arose from suspicious behavior by Mungle and two of his companions, both of

whom were arrested before Mungle led police to the defendant's home. *Id.* In the government's

argument that Mungle's consent was voluntary, the United States pointed to, among other facts,

the noncoercive length of Mungle's detention and his ability to understand the transpiring events.

*Id.* at 607. But the district court, in finding Mungle's consent involuntary, specifically considered

the following facts:

> (1) both Mungle and Thompson knew that Mungle was a probationer from
> Thompson's agency, a fact contributing to subtle coercion; (2) the police had
> arrested Mungle's two companions, leaving Mungle isolated; (3) both Mungle and
> [one of his companions] were under the influence; (4) the police performed two
> pat-downs of Mungle in the course of the "investigation" prior to entering
> [defendant's] home; (5) during the course of the pat-down, Thompson, the head of
> the agency of which Mungle was on probation from, found a small
> methamphetamine spoon, and then requested that Mungle cooperate and take him
> to the home of a known criminal suspect; and (6) when Mungle was positively
> asked for his consent, he refused.

*Id.* To the Sixth Circuit's review, these facts were sufficient to support the district court's finding

that Munger's consent was involuntary. *Id.*

Applying the guidance of the United States Supreme Court and the Sixth Circuit, the Court

agrees with the finding in Judge Ingram's Recommended Disposition that Ms. Suljicic's consent

in revealing Defendant's firearms was not rendered involuntary due to coercion by police officers

at the scene. [R. 57, pp. 9–10]. As in *Coolidge*, Ms. Suljicic led law enforcement to the bedroom

in the house where the evidence at issue was located and elected to disclose its location. 403 U.S.

at 486; [R. 32-2, p. 16; R. 33, USA-15 at 0:25–1:47]. Ms. Suljicic testified that when she did so,

she felt she could refuse the officers' request, did not feel pressured by them, and did not feel as

though the officers were using her child to threaten her into compliance. [R. 49, pp. 7–8]. Like

Mrs. Coolidge, Ms. Suljicic "of her own accord produced the guns . . . for inspection." 403 U.S.

at 489. Moreover, as in *Lawson*, Ms. Suljicic chose to reveal the presence of the firearm in the

closet without being ordered to do so by police. 137 F.4th at 419; [R. 33, USA-15 at 0:25–1:47].

Instead, police merely asked about the location of the firearms, an inquiry that—as discussed—

Ms. Suljicic felt comfortable refusing. [R. 49, pp. 7–8]. Ms. Suljicic, like Ms. Lawson, is an

educated individual holding a bachelor's degree, and she was not subject to "physical punishment"

or to "threats, promises, or other coercive measures" on September 29–30. 137 F.4th at 419 n.9;

[R. 49, pp. 6–11]. Lastly, unlike Mr. Mungle, Ms. Suljicic was not a probationer under suspicion

of a new crime, was not isolated from her child, and did not refuse consent. *Carr*, 187 Fed. App'x

at 607; [R. 49, pp. 6–11; 28]. Nothing in the record suggests that Ms. Suljicic felt "greatly afraid"

during her interactions with law enforcement, and even if she experienced some "subjective

concern" that she might suffer adverse consequences for refusing to reveal Defendant's guns to

the police, the inclusion of such a fact as part of the Court's the totality-of-the-circumstances

analysis would not tip the scale toward a finding of coercion or involuntariness, especially in light

of the clear video evidence presented. *Scott*, 578 F.2d at 1189; *Smith*, 850 F.2d at *2.

Additional facts also support the conclusion that Ms. Suljicic was not coerced into agreeing

to the search that revealed Defendant's guns. The record shows that Sheriff Jones only informed

Ms. Suljicic that he would be calling DCBS to the scene after she rejected his proposed alternative

custodial arrangements. [R. 33, USA-14 at 4:00–4:26]. During this exchange with Sheriff Jones,

it is clear she had no hesitation in rejecting his proposal to place her child with Defendant's

relatives, and reacted calmly, stating "okay," when he advised that he would otherwise have to call

DCBS. *Id.* at 4:21-4:26. That conversation occurred prior to another officer's inquiry in a different

part of the house as to the location of the firearms. [R. 33, USA-15 at 0:21–0:27]. Throughout her

interactions with law enforcement on September 30, 2024, none of the officers took an aggressive

or commanding tone that would suggest coercion. *See Wilson*, 806 F. App'x at 453; *see generally* [R. 33, USA-14; R. 33, USA-15]. Finally, Ms. Suljicic already disclosed the existence of the firearms to law enforcement during her conversation with them several days earlier on September 20, 2024. [R. 32-2 p. 3; R. 33, USA-190 at 5:45–5:57]. This conversation occurred without the potentially coercive factors Defendant now points toward, as Ms. Suljicic spoke with officers outside the home without any discussion of child custody. [R. 32-2 p. 3; R. 33, USA-190 at 5:45–5:57].

Moreover, the Court's careful consideration of Defendant's objections to Judge Ingram's Recommended Disposition does not find Defendant's arguments persuasive. Defendant first claims that Ms. Suljicic was "likely in a vulnerable emotional state" because she was "questioned by officers shortly after a domestic violence incident." [R. 57, p. 5]. Although the "possibly vulnerable subjective state" of the consenting party is a relevant consideration in the Court's determination as to coercion, *Schneckloth*, 412 U.S. at 229, Defendant does not cite to any evidence in the record to support this speculation as to Ms. Suljicic's emotional state. *See* [R. 57, p. 5]. Instead, the record points to Ms. Suljicic's strength and self-assuredness, as she not only testified to her comfort in refusing officers' requests but also actually did so by declining Sheriff Jones's suggestion that her child be temporarily transferred to the custody of Defendant's mother. [R. 49, pp. 6–8]. Therefore, the Court does not credit Defendant's speculation here.

Second, Defendant asserts that "officers [sic] discussion of custody issues regarding [Ms. Suljicic's] three-year old daughter could have created implicit pressure, leading her to believe that compliance was necessary to avoid adverse consequences." *Id.* Once again, Defendant's speculation is discredited by the video evidence presented and by Ms. Suljicic's testimony at the

evidentiary hearing, where she not only refused Sheriff Jones's suggestion regarding the temporary custody of her child, but also stated that she felt comfortable refusing the officers' request to show them the weapons, that she did not feel pressured or threatened by police regarding custody of her daughter, and that it was her voluntary decision to reveal Defendant's guns to the police. [R. 49, pp. 6–9]. The video evidence bears this out. *See* [R. 33, USA-15 at 0:21–1:10]. The Court thus finds this claim by Defendant unpersuasive.

Lastly, Defendant cites body camera footage showing Ms. Suljicic "beg[] officers not to take her child just before she removes the paneling in the closet" where the guns were hidden. [R. 57, p. 5]. Upon examination of the relevant body camera footage, it is not clear what Ms. Suljicic says at that time because she speaks at a low volume. *See* [R. 33, USA-15 at 1:20–1:26]. Whatever Ms. Suljicic said, the officer did not respond, either in agreement, with a threat, a promise, or any other response. *See id.* Even if the Court credits Defendant's characterization of the footage, however, the totality of the circumstances still indicates that Ms. Suljicic was not coerced into involuntarily consenting to the search. As repeatedly discussed, Ms. Suljicic's direct testimony at the evidentiary hearing strongly corroborates the opposite conclusion. [R. 49, pp. 6–9]. Further, even if Ms. Suljicic understandably had concern that she might suffer adverse consequences for refusing to reveal Defendant's guns to the police, such facts still would not rise to the point of coercion under the Sixth Circuit's precedent, especially given her testimony, the fact that she had voluntarily disclosed the existence of the guns to law enforcement several days earlier, and had already led the officer to the closet containing the guns before this exchange occurred. *Smith*, 850 F.2d at *2. Defendant's final objection thus does not tip the Court's assessment of the facts toward a finding of coercion.

### 3. Voluntariness

Judge Ingram's Recommended Disposition, responding to the parties' briefing on the issue of Ms. Suljicic's consent, largely considered separately the issues of Ms. Suljicic's intoxication and the coercive forces present at the scene. *See* [R. 56, pp. 5–10]. This Court organizes its analysis similarly and reaches the same conclusion. But, to be clear, the voluntariness analysis requires consideration of "the totality of all the circumstances"—in other words, consideration of the *combined* impact of Ms. Suljicic's intoxication *and* any police coercion on the voluntariness of her consent, in addition to other factors. *Schneckloth*, 412 U.S. at 227. Assessed together, the Court concludes that the totality of the circumstances does not warrant suppression of Defendant's firearms.

In consideration of "the totality of all the circumstances" outlined above, *see supra* Sections III(B)(1)–(2), the Court finds Ms. Suljicic's consent was voluntary. Regarding her intoxication, the Court determines that even if the PBT result is considered accurate, any drunkenness did not "diminish [Ms. Suljicic's] capacity to consent" because it did not "undermine[] [her] grasp on the reality of what [she was] doing." *Montgomery*, 621 F.3d at 572. Regarding coercion, the Court acknowledges the sensitive setting in which Ms. Suljicic gave her consent—one in which Ms. Suljicic may have genuinely feared that DCBS, called to the scene at Sheriff Jones's direction, would take her child from her. Yet even if Ms. Suljicic had "concern" about adverse consequences from denying her consent, this fact would be insufficient on this record given the totality of the circumstances indicating the voluntariness of her consent. *Smith*, 850 F.2d at *2. And, other indicia of coercion are absent from the scene, as police made no "demand[s]," asked "logical" questions, and made no attempts "to coerce or dominate" Ms.

Suljicic. *Coolidge*, 403 U.S. at 487, 489. Nor did police inflict "physical punishment" or use "threats, promises, or other coercive measures." *Lawson*, 137 F. 4th at 419 n.9. Consideration of other, more general voluntariness factors from the Sixth Circuit's test also suggests Ms. Suljicic consented voluntarily. *See Wilson*, 806 F. App'x at 453 (quoting *Worley*, 193 F.3d at 386). Ms. Suljicic is an "intelligen[t] and educat[ed]" individual holding a bachelor's degree and a job at the University of Kentucky, she "carried on an educated conversation" in response to officers' questions, felt comfortable refusing the request to reveal Defendant's guns, and was questioned in her own home where her daughter remained with her. *Wilson*, 806 F. App'x at 453 (quoting *Worley*, 193 F.3d at 386); [R. 49, pp. 5–9, 28, 41].

The totality of the circumstances considered as a whole, including Ms. Suljicic's intoxication, any possible coercive forces arising from police being at her home during a domestic violence call, and all other relevant facts, indicate that Ms. Suljicic voluntarily consented to the search of her home in which Defendant's cache of firearms was discovered. Therefore, the search was validly conducted pursuant to the consent exception to the Fourth Amendment's warrant requirement. *See Katz*, 389 U.S. at 357, 358 n.22. The Court will not suppress the fruits of that search.

### IV.    CONCLUSION

This Court has examined the record and agrees with Judge Ingram's Recommended Disposition to the extent not inconsistent with the Court's findings herein. Circling back to the PBT, as explained above, the weight of the evidence points to a PBT likely being administered. And, even considering its result reflected Ms. Suljicic was three times the legal limit for alcohol regarding the operation of a motor vehicle, such a result does not change the outcome here. Nevertheless, the Court desires additional clarity on the conflicting evidence and officer testimony

concerning whether a PBT was administered, especially in light of the additional video evidence the Court has highlighted herein pointing to a PBT being administered. To that end, the Court orders the United States to:

1. Review ALL the body camera footage, with full volume on, including that cited by the Court herein related to evidence concerning a PBT being discussed and potentially administered. *See supra* Section III(B)(1); [R. 33, USA-15 at 0:18–0:19, 0:27, 4:05 (video progress bar); 0:58:14–58:16, 1:01:31–01:32, 1:02:01 (footage)];[6]

2. Identify the officer depicted potentially administering the PBT at [R. 33, USA-15 at 4:05 (video progress bar); 1:02:01 (footage)] and any other officer seen or heard discussing the PBT, including those at [R. 33, USA-15 at 0:18–0:19, 0:27 (video progress bar); 0:58:14–58:16, 1:01:31–01:32 (footage)];

3. Consult with the officers and any other officer seen or heard discussing the PBT about the events depicted therein and, in light of the additional video evidence identified by the Court, inquire again whether such video evidence affects the officers' recollections, reports, and testimony about whether a PBT was administered;

4. Inquire about and produce any available PBT results, and supplement the record to ensure that any and all officer reports recounting the events of September 29–30, 2024, have been supplied to the Court; and

5. File a status report with the Court within fourteen (14) days detailing the United States's findings.

---

[6] Here and below, the Court cites to both the time stamp from the video progress bar and from the top-right corner of the body camera footage, designating each accordingly.

Accordingly, for the reasons set forth above, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. The Magistrate Judge's Recommended Disposition, [**R. 56**], is **ADOPTED** as the opinion of this Court to the extent that it is not inconsistent with this Order;

2. Defendant's Motion to Suppress, [**R. 32**], is **DENIED**.

This the 9th day of October, 2025.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

- 31 -